# United States Court of Appeals
# for the Federal Circuit

---

**ROBERT WADE WHITMORE,**
*Petitioner,*

**v.**

**DEPARTMENT OF LABOR,**
*Respondent.*

---

2011-3084

---

Petition for review of the Merit Systems Protection Board in case no. DC0752090890-I-1.

---

Decided: May 30, 2012

---

PAULA DINERSTEIN, Public Employees for Environmental Responsibility, of Washington, DC, argued for petitioner.

LAUREN A. WEEMAN, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and TODD M. HUGHES, Deputy Director. Of counsel on the brief were JAMES V. BLAIR, Acting Deputy Associate Solicitor, and

JENNIFER M. DILLARD, Attorney, United States Department of Labor, of Washington, DC.

---

Before RADER, *Chief Judge*, and O'MALLEY and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

Robert Whitmore ("Whitmore") appeals the decision of the Merit Systems Protection Board ("MSPB"), which declined to set aside Whitmore's removal from his position with the Department of Labor ("DOL"). While the DOL alleged that Whitmore's removal was due to his increasingly disruptive and insubordinate behavior, Whitmore alleged that the removal was an unlawful retaliation for his lawful whistleblowing disclosures. In analyzing whether the DOL had proven by clear and convincing evidence that Whitmore would have been removed regardless of his whistleblowing disclosures, the MSPB excluded or ignored evidence offered by Whitmore necessary to adjudicate Whitmore's retaliation claim, and otherwise applied the law incorrectly. Accordingly, we vacate and remand for further fact finding wherein all of the relevant evidence is considered pursuant to correct legal standards.

## I.   FACTUAL BACKGROUND

Whitmore began his 37-year career in the Department of Labor in 1972 as an economist with the Bureau of Labor and Statistics ("BLS"). Beginning in 1987, Whitmore served as the head of the Recordkeeping Requirements group of the BLS, and the group was transferred in 1990—with Whitmore remaining as its head—to the Office of Statistical Analysis ("OSA"), Directorate of Evaluation and Analysis ("DEA") in the Occupational Safety and Health Administration ("OSHA"). For his

entire career prior to 2005, Whitmore regularly received better than satisfactory performance reviews, bonuses, and awards, and was never subject to any discipline.

In 2005, Whitmore began making public disclosures alleging that OSHA was failing to enforce its recordkeeping requirements and acquiescing in industry reports of impossibly low numbers of injuries and illnesses, which allegedly hampered OSHA's ability to target inspections and undertake enforcement actions to prevent such injuries and illnesses. In April of 2005, Whitmore provided comments for an article in the Oakland Tribune regarding questionable worker injury numbers being reported by a bridge construction company that had partnered with California OSHA, which is overseen by federal OSHA. Whitmore was quoted as saying he found the reported injury rates in the dangerous work of construction on the Bay Bridge were "hard to believe, and require verification," and also stated that the company's practices pressured workers to avoid reporting injuries. A954, A960.[1]

Also in 2005, Whitmore provided an affidavit supporting a co-worker, Kim Ngyuen, in her Equal Employment Opportunity ("EEO") complaint for alleged discrimination and retaliation by her managers at OSHA. Whitmore's affidavit attested in particular to improper discriminatory action by OSHA official Bob Pitulej. Nguyen's case was resolved via settlement, and Pitulej later became the Deputy Director of DEA within Whitmore's chain of command.

The record shows that shortly after the Oakland Tribune article appeared, Keith Goddard, DEA's Director, told Mark Kitzmiller, an OSHA employee supervised by

---

[1]    Citations to "A___" herein refer to pages of the Joint Appendix filed by the parties.

Whitmore, that Steve Witt, OSHA's Director of Cooperative and State Programs, was upset about Whitmore's comments in the Oakland Tribune. Testimony from Kitzmiller indicates that Witt said he was "going after" Whitmore. A482, A508. Whitmore's comments were viewed by Goddard as "unprofessional" for being made "improperly and without permission" to speak on behalf of OSHA. A899-900, A1037-38. Goddard would later propose Whitmore's removal in 2007, but Witt was the proposing official in Whitmore's ultimate removal in 2009, as explained below.

After the Oakland Tribune article, Whitmore's performance review was changed from "highly effective" to "meets expectations" by his direct supervisor, Joe Dubois. It was Whitmore's first performance review in 35 years in which he was not rated as "outstanding" or "exceeds expectations." What followed was a two-year period in which Whitmore made additional whistleblowing disclosures, throughout which time tension between Whitmore and his supervisors continually increased until reaching a breaking point in July of 2007.

## A. Tensions Mount

Due to various medical and personal matters, Whitmore had been taking a significant amount of time on leave from work. Following the 2005 Oakland Tribune article, however, Whitmore's leave totals as reported by Dubois soon began to diverge from the totals maintained by the payroll system and from Whitmore's own informal calculations. Whitmore's attempts to speak with Dubois and/or Goddard about this issue were ignored or met with hostility. Whitmore and Dubois got into numerous arguments, resulting in a strained professional relationship.

In early 2006, Whitmore began working with reporters for the Charlotte Observer on a series of articles

relating to non-reported injuries in the poultry processing industry. One of the articles in the series is titled "He says his agency is at fault – Recordkeeping chief says OSHA lets companies underreport injuries." A956-66, A696. The article reported Whitmore as stating that OSHA was "leaving businesses to police themselves" and had little awareness of the hazards in certain industries. *Id.*

By late 2006, in response to Whitmore's continued attempts to have his leave time properly granted and credited, Dubois instituted a special personnel procedure, unique to Whitmore, requiring Whitmore to present "an original doctor's note supporting [his] illness claim" whenever he called in sick. A768. Both Dubois and Goddard ignored Whitmore when he requested leave for serious health or family problems, and Dubois would charge Whitmore with Leave without Pay and Away Without Leave even though Whitmore had been directed by his physician to take time off.

In 2007 Whitmore posted an offensive sign on his door, stating that that everyone must knock to enter his office, and that "P.S. That *includes* you Ms. Feeling," referring to Dubois's assistant (actually named Cheryl Fielding). A752, A826.001-.003. Whitmore testified that he believed Ms. Fielding was snooping in people's offices, and that given the hostility he felt generally directed toward him around OSHA, he was concerned for his safety. A401-02. After being repeatedly asked to remove the sign, Whitmore instead changed the name from "Ms. Feeling" to "Joe" Dubois. A752, A826.002.

Throughout this time period, Whitmore sent a number of emails highly critical of if not hostile to Dubois, copying Whitmore's staff as well as OSHA officials having nothing to do with Whitmore's leave or his disputes with

Dubois. A767-826 (stating, for example, "I had difficulty sleeping last night after the week-long additional harassment that you put me through . . . we both know the stress you are giving me is intentional and has got to stop"; "If I am not paid my full salary for this pay period, and done so in a timely manner, I will hold you personally responsible"; and "this illegal action smacks of retaliation"). This insubordinate email behavior by Whitmore escalated over time, and resulted in Whitmore's being admonished by Robert Poogach, the Deputy Director of OSHA's Administrative Office, for copying uninvolved parties on his private issues, but Whitmore did not cease such practices. A818 ("I would also add my disappointment that in your email to me you chose to continue your practice of cc'ing staff members in communications that does [sic] not properly concern them."). For his part, Dubois perpetuated such argumentative email threads between himself and Whitmore, copying uninvolved OSHA officials. *See, e.g.*, A790 (copying Goddard and six other OSHA employees on email stating "I have no control over this [religious comp time policy], but you whined about it for several months"); A783-84 (copying Goddard and six other OSHA employees on email stating "[y]ou have over two years of advanced sick leave, I am not approving any more"); A798 (copying Goddard and two other OSHA officials on email to Whitmore, stating "for the third time, I direct you to remove the sign taped to your door . . . [a]nd thank you for slamming your door in my face").

On March 20, 2007, Whitmore submitted a Waste, Fraud, and Abuse claim to the DOL office of the Inspector General ("IG") regarding an illegal gambling pool for the NCAA Men's Basketball tournament conducted by Dubois using government resources. Dubois' computer was confiscated by the IG, but no charges were ever pressed

against him. On March 22, 2007, two days after Whitmore disclosed Dubois' purported illegal gambling activities, Dubois notified Whitmore that he was taking away Whitmore's authority as a rating official—i.e., removing Whitmore's responsibility for conducting the performance evaluations of the OSA personnel under Whitmore's supervision.

In early 2007, the record shows that Dubois told Kitzmiller that he was intentionally altering Whitmore's timesheets to deprive Whitmore of leave time. In May 2007, Whitmore's numerous requests for a formal leave audit were finally granted, and the results were much closer to Whitmore's totals than Dubois's, finding 75 hours of leave time that had not been properly credited.

Whitmore received "minimally satisfactory" performance evaluations in 2006 and 2007. He continually sought an opportunity to discuss his leave and other alleged harassment issues with his supervisors, or to otherwise remedy the problems via OSHA's internal grievance procedures, but to no avail.

Goddard wrote two memoranda in the spring of 2007 describing Whitmore's behavior. An April 2007 memo described Whitmore as disruptive, showing signs of potential workplace violence and exhibiting disturbing bullying behavior. A903. A June 2007 memo noted the continued escalation of Mr. Whitmore's unprofessional conduct, and again expressed concerns for safety of other OSHA personnel. A899.

### B. The July 10, 2007 Incident

On the morning of July 10, 2007, Whitmore went to Dubois's office to discuss a leave request and the discussion became heated, with Dubois ordering Whitmore to leave his office. Whitmore later encountered Dubois in

the hall and called Dubois a "chickenshit" for not allowing them to meet with Goddard together, and Dubois retorted "you're chickenshit." A318, A417-18. As Dubois walked away, Whitmore followed closely behind in a prancing fashion, mimicking Dubois until Dubois turned around and Whitmore went back to his office. Later, Whitmore came back to Dubois's office to discuss a work assignment and Dubois dismissively told him that the instructions were clear. When Whitmore attempted to broach the subject of the leave request again, an argument ensued and Dubois told him to leave or he would call security. Whitmore complied and waited outside Dubois' office, then sparked another argument by suggesting that he should submit a new complaint to the DOL IG regarding Dubois's illegal use of government resources to produce literature for his wife's election campaign. At that point, Whitmore testified that Dubois briskly walked up to Whitmore, made a hawking sound, and intentionally spit on his chest. Whitmore then yelled out: "I can't believe you spit on me!" A421, A496. Dubois testified that Whitmore had also spit on him. The AJ later found that both men's spitting on the other was not likely intentional, but was an inadvertent consequence of their high tempers and yelling in close proximity to each other.

When Dubois attempted to close the door, Whitmore put his foot in the way and told Dubois that if he ever spit on him again, he would "knock him into the basement." A420-21. Whitmore testified that this was "the first time and only time . . . I threatened someone with physical violence." A420. Whitmore then removed his foot from the door and walked down the hallway, yelling for someone to call security. In the hallway Whitmore encountered Dave Schmidt, director of OSA, standing in a narrow passageway between a wall and some filing cabinets. On the other side of the narrow passageway was

Goddard's office, and Whitmore wanted to show Goddard the spit on his shirt and explain the situation. Whitmore claimed Schmidt would not allow him to pass to Goddard's office. Whitmore then physically pushed past Schmidt while yelling "get out of my way," and possibly also spit on Schmidt. A423-24. Whitmore expressed that he was so angry he "could have just cold cocked [Mr. Schmidt] right then and there" for blocking his way out of the area. A424.

On July 12, 2007, David Schmidt sent a memorandum to the Director of OSHA's Directorate of Administrative Programs complaining of "[u]nacceptable conditions associated with workplace violence." A756, A1038. The memorandum indicated that Whitmore's "actions ha[d] led to a genuine feeling of fear by several employees," and that those employees requested OSHA to take action that would keep the office free of fear and violence. A756-57, A1038.

A week after the July 10, 2007 incident, Whitmore was placed on paid administrative leave, where he remained for two years until his ultimate removal. Dubois was never subject to any disciplinary action.

## C.  The Morgan Investigation

After Whitmore was placed on administrative leave, DOL hired David Morgan, a former OSHA employee, to investigate the July 10 incident and concerns about a hostile work environment. Whitmore contends that Morgan was biased in favor of OSHA in prior whistleblower investigations, and was hired not to conduct an impartial investigation but to build a case against Whitmore to legally support his removal. In one chain of emails with OSHA's Robert Poogach, Morgan referred to himself and OSHA collectively as "we," expressed hope

that "we" would "kick [the whistleblower's] ass this time," and called Whitmore a "lying dog." A680-81.

Whitmore further contends that Morgan selectively chose to interview only those witnesses who were adverse to Whitmore. The selected witnesses came from a list prepared by Goddard of people that could "attest to the bullying and aggressive behavior of Mr. Whitmore," and others referred by those persons on Goddard's list. Moreover, Whitmore contends that Morgan pressured witnesses and tampered with their statements to make his report more favorable to OSHA. For example, Whitmore points to an email from Cecimil Maldonado, an OSHA Labor Relations Officer, forwarding a statement by OSHA employee Richard Fairfax to Morgan, stating: "[h]ere is the Fairfax statement . . . it's not what we wanted." A670. Morgan responded by suggesting that he may need to "go after Fairfax again . . . ." A674. As another example, Whitmore points to an early statement by DEA employee Clay Taylor expressing the view that Whitmore was the victim of intentional retaliation and a hostile work environment, stating in particular that "Keith Goddard puts Joe Dubois up to things to mess with Mr. Whitmore, like denying his leave and changing the evaluation rating official, taking the responsibility away from Mr. Whitmore." A637. Later this sentence was omitted in a revised statement because, as Taylor explained, "at the time I was very upset about some issues and I believe my anger shows in my statement." A635, A669. In response to this change, Morgan commented in an email: "Looks like Clay may have wised up." A669. The OSHA Labor Relations Officer to whom Morgan's email was addressed responded: "Yes!" A669. Whitmore also noted that several witnesses expressed views unfavorable to him who had little to no dealings with him. A855, A905-06 (e.g., "Bob Whitmore is the problem," his "behavior is of a

bullying nature," "something bad is going to happen it's just a matter of time").

Morgan's report, dated November 22, 2007, contained lengthy summaries of the various interviews and documentary evidence, and concluded that Whitmore's conduct implicated DOL's Workplace Violence Program, and warranted "permanent action" against Whitmore to protect OSHA's other employees from harm. A829, A859. On November 20, 2007, however, two days before Morgan's report was even completed, Goddard had already authored a proposed notice for removal of Whitmore, citing the July 10, 2007 incident as well as other disrespectful and intimidating conduct including Whitmore's emails to Dubois copying various uninvolved OSHA personnel. A1036-57. Goddard's proposal was not issued at that time, however.

### D. Whitmore's Final Disclosures and Removal

Whitmore continued to make whistleblowing public disclosures and comments while on paid administrative leave. On June 19, 2008, he testified before Congress regarding the underreporting of workplace injuries and illness, where he accused senior OSHA management of intentionally ignoring fraudulent data submitted by employers. A967-76. On June 27, 2008, he appeared on a television program again discussing recordkeeping deficiencies, concluding that OSHA was "not there representing the workers. We're representing the businesses." A977-82. On February 18, 2009, the Washington Post published an article about Whitmore's various disclosures and the fact that he had been placed on extended administrative leave. A527-28. The DOL IG saw the article and wrote to the Acting Deputy Secretary, who then spoke to the Deputy Assistant Secretary, stating that the agency needed to "resolve this one way or the other." A190.

A few weeks later on April 3, 2009, the DOL issued a notice of proposed personnel action proposing the removal of Whitmore from his position. A748-55. The 2009 proposal was not the same one that had been authored (but not issued) by Goddard in 2007, although the substance of the 2009 proposal was essentially the same. This time, the proposal was authored by Steven Witt with Donald Shalhoub, Deputy Assistant Secretary, as the deciding official, both of whom were outside Whitmore's chain of command. Witt's proposal extensively summarized and quoted from Morgan's report, and reached the same conclusion that a permanent removal of Whitmore was necessary. A756-63, A827-859.

The April 3, 2009 proposal charged Whitmore with Disruptive and Intimidating Behavior, Conduct Unbecoming a Supervisor, and Inappropriate Conduct in the Workplace. The July 10, 2007 incident formed the basis for the first charge, while the latter two charges were based on the several emails concerning Whitmore's disputes with Dubois in which he took an accusatory tone with Dubois and copied his staff and other OSHA management officials. A12-13, A748-55. The AJ later found these emails to be written and sent in an attempt to embarrass Dubois and undermine his authority. A12-14. The proposal stated that the removal was necessary due to Whitmore's "unprofessional, highly disruptive, and totally unacceptable [behavior] in the workplace," which "severely undermined the confidence of OSHA management in [his] judgment, and ability to carry out [his] responsibilities in an appropriate manner . . . ." A764. It concluded that Whitmore's actions had "created a dysfunctional and fearful environment . . . ." A764. Mitigating factors, such as Whitmore's long tenure as a good employee, were considered, but were deemed outweighed

by the seriousness of his conduct and his undermining authority within OSHA.  A765.

Witt's 2009 proposal echoed the proposal authored in 2007 by Goddard.  Indeed, the two proposals were so substantively similar that on April 14, 2009, ten days after the Witt proposal was completed, OSHA's Robert Poogach wrote an email to David Morgan specifically questioning whether Witt's proposal in fact reflected Witt's independent review and judgment:

> I'm confident that we can make the case that this is not tied to any protected activity . . . .  I'm more concerned that we drafted that proposal in November 2007 and that it then magically appeared as Witt's proposal in April 2009 . . . in large measure as drafted (with major subsequent tweaks) originally. *So dod [sic] Witt do an independant [sic] read of teh [sic] facts or was he merely the guy duped into signing what we had long ago decided?*

A680 (second ellipsis in original) (emphasis added). Nevertheless, Witt and Shalhoub claimed to have independently reviewed the facts surrounding Whitmore's administrative leave, and Witt testified that he believed "anything less than removal would continue the same problem, expose people in [DOL] to Mr. Whitmore and possible violence and intimidating behavior." A122.

The decision to remove Whitmore was made final by Shalhoub on July 13, 2009, and became effective July 31, 2009.

## II.  PROCEDURAL HISTORY

Whitmore challenged his removal at the MSPB, alleging that the removal was an act of retaliation for his whistleblowing disclosures under 5 U.S.C. § 2302(b)(8). He also alleged that, under 5 U.S.C. § 2302(b)(9), his

removal was retaliation for his EEO testimony given in 2005, which implicated one of his managers in a discrimination case brought by a co-worker.

A.   The AJ's Exclusion of Witnesses from the Hearing

The AJ strictly limited the number of witnesses permitted to testify at Whitmore's hearing. Of Whitmore's twelve requested witnesses, the AJ only approved three: Whitmore, Mark Kitzmiller, and Kie'arra Pretlow.[2]  For the DOL, the AJ approved Shalhoub, Witt, and Dubois. The AJ's rationale was that other than Whitmore and the proposing and deciding officials, only those such as Kitzmiller who had actually witnessed the July 10 incident could offer sufficiently pertinent testimony. The AJ thus treated the hearing as if it only functioned to examine the proof of the charges and the reasonableness of the penalty—not Whitmore's whistleblower defense.

Among Whitmore's nine excluded witnesses were David Morgan and the witnesses interviewed during Morgan's investigation. These witnesses were offered to show bias on the part of Morgan and OSHA officials against Whitmore, as well as proof that the stated reasons for Whitmore's removal were a mere pretext for his being removed due to his whistleblowing disclosures. The AJ excluded these witnesses because she believed they "are not material to the central issue in this matter, but rather have only peripheral relevance . . . ." A75.  Several of those witnesses interviewed by Morgan were also offered to testify as to Whitmore's integrity, leadership, and commitment to OSHA's mission, as well as the alleged

---

[2]  Ms. Pretlow was an OSHA employee alleged to have witnessed the July 10, 2007 incident, but she ultimately did not testify at the hearing since she denied having actually witnessed the event.

harassment of Whitmore by Dubois and others creating a hostile work environment to provoke Whitmore.

Another witness offer by Whitmore named Eleanor Lauderdale was a non-OSHA DOL employee offered to testify regarding a DOL manager whose act of physical assault resulted in no discipline (and in fact the manager was later promoted).   The AJ excluded her testimony because Whitmore failed to timely provide the AJ with a detailed summary of Ms. Lauderdale's testimony, as the AJ had requested.

Also precluded by the AJ was the testimony of Dr. Adam Finkel, another OSHA whistleblower investigated by David Morgan and removed from his position, regarding bias at OSHA against whistleblowers.  A declaration signed by Finkel attests to various matters about which he would have testified at the hearing if given the opportunity.  Finkel declared that certain OSHA officials had in the past made threats of violence to coworkers such as "[i]f you ever say that again, I'll squeeze your head like a grape until it explodes," "I'm going to tear you limb from limb," and "I'm going to kill you," but that "none was ever taken seriously, and no discipline or other action resulted from them."  A657-68.  Finkel chalked all of this up to being "products of the stress and tension that permeated the Agency," and commented that "[t]he senior leadership at OSHA clearly regards such statements as unremarkable, even funny, when they are made by favored colleagues."  A658.  Finkel also recounted an instance where an employee slammed a door so hard in Finkel's office that the hinges popped off and had to be replaced, but Finkel never reported the incident since he believed that no action would be taken against her.  A657.

The AJ thus admitted only testimony as to the affirmative charges brought against Whitmore, and ex-

cluded witnesses offered to support Whitmore's affirmative whistleblowing defense.

### B.  The Exclusion of Evidence Regarding Whitmore's EEO Defense

Whitmore raised an affirmative defense pursuant to 5 U.S.C. § 2302(b)(9) based on his participation in the 2005 EEO proceeding, in which he implicated OSHA official Bob Pitulej, who later became Whitmore's second level supervisor, in discrimination claims.  The AJ initially bifurcated the hearing to address the EEO issue only if the DOL failed to carry its burden to overcome Whitmore's whistleblower defense.  After the hearing, the AJ explained that she now recognized that Whitmore's EEO participation was offered not only as whistleblowing activity to support Whitmore's whistleblower defense under § 2302(b)(8), but also to show retaliation for participation in an EEO proceeding, a distinct defense under § 2302(b)(9) and therefore "a new claim, albeit based on the same evidence."  A109.  Accordingly, she deemed her previous decision to exclude Whitmore's EEO defense from the hearing to be erroneous, and reopened the record permitting Whitmore to submit additional evidence and argument to support the EEO defense.  The record does not show that Whitmore submitted any new evidence or argument in response to the AJ's invitation.

### C.  The AJ's Decision on Whitmore's Whistleblower Defense

The AJ correctly understood that in the burden shifting scheme for whistleblower cases, the agency must first prove its case for removal by a preponderance of the evidence, 5 C.F.R. § 1201.56, then the former employee must prove by a preponderance of the evidence that he or she made a protected disclosure under 5 U.S.C. § 1202(b)(8) that was a contributing factor to the employee's

termination.  If the employee establishes this *prima facie* case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken "the same personnel action in the absence of such disclosure."  5 U.S.C. § 1221(e).  The AJ ultimately found that Whitmore had made protected disclosures, and that these disclosures were a contributing factor in the removal action.  The AJ rejected Whitmore's whistleblower defense, however, finding that he would have been removed regardless of his whistleblowing disclosures.  This appeal centers around whether the DOL carried its burden to show by clear and convincing evidence that it would have removed Whitmore regardless of his protected disclosures.

### 1.   The DOL's Affirmative Case for Removal

The AJ determined that the DOL had proven all of the charges against Whitmore by a preponderance of the evidence, and that the penalty of removal was reasonable.  Nearly all of the critical facts surrounding the July 10, 2007 incident charge were admitted by Whitmore, and regarding certain disputed facts—e.g., whether Dubois intentionally spit on Whitmore—the AJ expressly found Dubois to be a more credible witness than Whitmore and concluded that Dubois' spitting was unintentional.  The AJ found the July 10, 2007 incident to exhibit inexcusable Disruptive and Intimidating Behavior by Whitmore as charged.  As stated by the AJ, "violence in the workplace has an adverse effect on the agency's mission as well as its employees and cannot be tolerated." A17.  Whitmore's emails and door sign were likewise found to satisfy the charges of Conduct Unbecoming a Supervisor and of Inappropriate Conduct in the Workplace.

The AJ rejected Whitmore's argument that his removal must be set aside since Witt and Shalhoub relied

heavily on the Morgan report, which Whitmore contended was objectionable as biased and inherently untrustworthy. The AJ found that Witt and Shalhoub in fact relied on considerable documentary evidence other than the Morgan report to justify their decisions, and the AJ in particular noted Shalhoub's testimony that he did not adopt Morgan's conclusions and would have removed Whitmore regardless of the report.

Citing Whitmore's lack of remorse for his actions, his belief that his conduct was justified due to the harassment by Dubois, and the overall escalation of his inappropriate behavior, Shalhoub testified that no penalty short of removal would be effective to avoid similar problems in the future, and the AJ agreed. The removal penalty was deemed reasonable given Whitmore's supervisory position and the seriousness and impropriety of his actions, which fell "shockingly short" of the standards of integrity, judgment, and professionalism expected of one holding such a position, and which had a substantial negative effect on the trust and confidence in Whitmore overall. A17-18.

### 2. The DOL's Proof that Whitmore Would have Been Removed Absent his Whistleblowing Disclosures

The AJ next found that the DOL proved by clear and convincing evidence that Whitmore would have been removed regardless of his protected disclosures. A19-22. To make this finding, the AJ applied the *Carr* factors for determining whether an agency has met its burden via clear and convincing evidence: "[1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistle-

blowers but who are otherwise similarly situated." *Carr v. Soc. Security Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

As to the strength of the agency's evidence in support of Whitmore's removal, since nearly all of the facts surrounding Whitmore's charges were admitted or supported by documentary evidence which spoke for itself, the AJ viewed the strength of the DOL's evidence to be very strong. The AJ again rejected Whitmore's allegation that the Morgan report was unreliable and unfairly prejudicial, deeming the Morgan report "irrelevant to the charges at issue here, since the charges did not arise from the report or the witness statements, and their proof did not depend on the validity, or not, of Morgan's report." A19. In any event, the AJ found that despite Whitmore's allegations concerning Morgan's bias and other impropriety, merely referencing Morgan's report or summarizing facts contained therein did not import Morgan's conclusions into the charges against Whitmore.

The AJ next found insubstantial evidence to support a finding of a retaliatory motive, since Witt and Shalhoub were outside Whitmore's chain of command, were not directly implicated in any of Whitmore's whistleblowing, and had only limited knowledge of Whitmore's whistleblowing disclosures.

Lastly, the AJ rejected Whitmore's argument that he was treated differently from similarly situated non-whistleblowers, pointing in particular to Dubois who was subject to no disciplinary action whatsoever. Although Dubois also wrongfully engaged in argumentative conduct with Whitmore, the AJ deemed Whitmore more at fault for being the instigator and the one who threatened physical violence. Thus, Dubois was not viewed as being similarly situated to Whitmore for comparison purposes.

Accordingly, the AJ concluded that the DOL had proven by clear and convincing evidence that Whitmore would have been removed regardless of his whistleblowing.

### D.  The AJ's Decision on Whitmore's EEO Defense

The AJ rejected Whitmore's EEO defense on the merits. Although Whitmore contended that his hostile treatment by Dubois, Goddard, and Pitulej (who was implicated in Whitmore's EEO affidavit) began after his participation in the EEO proceeding, the AJ found that Whitmore failed to prove any nexus between the EEO proceeding and his removal, which were separated in time by four years. In particular, the AJ noted that Pitulej had no role in Whitmore's removal, and that Witt and Shalhoub were aware of Whitmore's EEO participation only because Whitmore raised the issue in his reply to his proposed removal. The AJ found nothing in the record to support Whitmore's suggestion that Witt and Shalhoub were influenced by Pitulej or any other OSHA officials regarding a motive to retaliate for Whitmore's EEO participation.

\* \* \*

The full board denied Whitmore's petition for review, and the AJ's decision was made final. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

### III. DISCUSSION

By statute, we may set aside the judgment of the MSPB if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). In

exercising this limited scope of review, we do not consider how we would have decided the case in the first instance, and may not merely substitute our judgment for that of the board. *See Mendoza v. Merit Systems Protection Bd.*, 966 F.2d 650, 653 (Fed. Cir. 1992).

As explained in detail below, in this case the AJ unduly focused both the hearing and her decision on the DOL's affirmative case for removal of Whitmore, to the exclusion of Whitmore's whistleblower defense. Because we conclude that the MSPB abused its discretion regarding evidentiary matters, and failed to adjudicate Whitmore's whistleblower defense in accordance with the law, we vacate and remand for further proceedings in accordance with the following discussion.

## A. Background Law

The Whistleblower Protection Act of 1989 prohibits retaliation for whistleblowing, and provides as follows:

Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not . . . take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not

specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs; or

(B) any disclosure to the Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety . . . .

5 U.S.C. § 2302(b)(8). Analysis of a whistleblower defense takes place within a burden shifting scheme, wherein the agency must first prove its case for removal by a preponderance of the evidence, 5 C.F.R. § 1201.56, then the former employee must prove by a preponderance of the evidence that he or she made a protected disclosure under § 1202(b)(8) that was a contributing factor to the employee's termination. If the employee establishes this *prima facie* case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken "the same personnel action in the absence of such disclosure." 5 U.S.C. § 1221(e).

### 1. The "Clear and Convincing" Evidence Standard

The Supreme Court has explained that "[t]he purpose of a standard of proof is to instruct the factfinder concern-

ing the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *California ex rel. Cooper v. Mitchell Bros. Santa Ana Theater,* 454 U.S. 90, 92-93 (1981) (citations and internal quotation marks omitted). The "clear and convincing standard" is understood to be "reserved to protect particularly important interests in a limited number of civil cases." *Id.* at 93. When enacting the Whistleblower Protection Act of 1989, Congress explained its reasoning for requiring clear and convincing evidence as follows:

> "Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action—in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards— the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.

135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20). Against this backdrop, there is no doubt that Congress considered it very important that federal agencies be required to clearly and convincingly rebut a *prima facie* case of whistleblower retaliation, especially given the

evidentiary disadvantages that face removed whistle-blowers.

Whether evidence is sufficiently clear and convincing to carry this burden of proof cannot be evaluated by looking only at the evidence that supports the conclusion reached. Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion. *See, e.g.*, *Li Second Family L.P. v. Toshiba Corp.*, 231 F.3d 1373, 1381 (Fed. Cir. 2000) ("When determining whether [deceptive] intent has been shown by clear and convincing evidence, a court must weigh all evidence, including evidence of good faith."); *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993) (vacating and remanding because the Board failed to consider certain testimony, explaining that under the clear and convincing evidence standard "*all* of the evidence put forth by Price, including any of his *corroborated* testimony, must be considered as a whole, not individually, in determining whether Price conceived the invention of the count before Symsek") (emphasis in original). It is error for the MSPB to not evaluate all the pertinent evidence in determining whether an element of a claim or defense has been proven adequately.

The Whistleblower Protection Act makes clear that whistleblowing provides an important public benefit that must be encouraged when necessary by taking away fear of retaliation. *Horton v. Dep't of the Navy*, 66 F.3d 279, 282 (Fed. Cir. 1995) ("The purpose of the Whistleblower Protection Act is to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it, either directly by management authority, or indirectly as in disclosure to the press."). Yet Congress understood that whistleblowers are at an evidentiary disadvantage in proving their cases. In many instances, our review of

whistleblower appeals turns on whether substantial evidence exists to support the judgment of the MSPB. However, we are unable to make such determinations if the MSPB fails to provide an in depth review and full discussion of the facts to explain its reasoning. Such a complete evaluation of the facts is necessary in every case because outside of written opinions and transcribed oral statements, we have no basis to discern the reasoning of the MSPB and decide whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Massa v. Dep't of Def.*, 815 F.2d 69, 72 (Fed. Cir. 1987) (internal quotation marks omitted). If considerable countervailing evidence is manifestly ignored or disregarded in finding a matter clearly and convincingly proven, the decision must be vacated and remanded for further consideration where all the pertinent evidence is weighed.

### B. Witnesses Excluded from the Hearing

In general, "[p]rocedural matters relative to discovery and evidentiary issues fall within the sound discretion of the board and its officials." *Curtin v. Office of Pers. Mgmt.*, 846 F.2d 1373, 1378 (Fed. Cir. 1988). "If an abuse of discretion did occur with respect to the discovery and evidentiary rulings, in order for petitioner to prevail . . . he must prove that the error caused substantial harm or prejudice to his rights which could have affected the outcome of the case." *Id.* In this case, the AJ excluded numerous witnesses from the hearing that caused substantial harm and prejudice to Whitmore's right and ability to present a complete whistleblower defense under *Carr*.

First, the AJ erred in summarily excluding David Morgan and his interviewees from testifying at the hearing. The AJ's rationale for this exclusion was on rele-

vance grounds, stating that the witnesses "are not material to the central issue in this matter, but rather have only peripheral relevance . . . ." A75; *see also* A19 ("I found Morgan's report of his investigation, and the employee interviews he attached to it, irrelevant to the charges at issue here."). The "central issue," in her mind, was the July 10, 2007 incident and the charges leveled against Whitmore; she found the alleged bias and impropriety pervading the Morgan investigation was not relevant to the charges. This was an abuse of discretion. The first two *Carr* factors plainly deem the strength of the agency's evidence and the existence of any retaliatory motive to be relevant considerations in determining whether the DOL has proven that an employee would have been removed regardless of his whistleblowing disclosures. *Carr*, 185 F.3d at 1323. Whitmore was entitled to introduce testimony calling into question the veracity and reliability of Morgan's report and the interviewees' statements therein, since at least some evidence in the record suggests that Morgan's report was relied on by Witt and Shalhoub in their decision to remove Whitmore. *See, e.g.*, A748 (Witt's proposed removal notice stating that the situation revealed in Morgan's report formed "the basis for this proposal"); A138 (Witt admitting that Morgan's investigation formed "part of the support for Specification 1" of Whitmore's proposed removal); A292-93 (Shalhoub admitting that he relied on certain statements from the Morgan report). Indeed, the proposed removal notice itself extensively summarizes and quotes from the Morgan report. A756-63, A827-859. The AJ moreover dismissed Whitmore's contentions by suggesting that there was "nothing inappropriate" about Witt and Shalhoub relying on the witness statements gathered by Morgan, as opposed to Morgan's conclusions, but this fails to account for Whitmore's allegation that the

statements themselves were selected in a biased fashion and were tampered with by Morgan. A19-20.

Eleanor Lauderdale's testimony was excluded because Whitmore failed to timely provide the AJ with a detailed summary of Ms. Lauderdale's testimony, as the AJ had requested. This was a reasonable request from the AJ, intended to discern whether Ms. Lauderdale was being offered as a mere character witness or for some other purpose. We see no abuse of discretion in excluding Ms. Lauderdale's testimony on this basis.

Lastly, it was an abuse of discretion to exclude the testimony of Dr. Finkel. Dr. Finkel was an OSHA whistleblower previously removed from his position and investigated by David Morgan. Although the AJ does not specifically explain her reasoning for excluding Finkel in particular, it appears that this decision was based on relevance grounds akin to those for excluding Morgan. A75 ("The remaining lengthy list of proposed witnesses on both sides were not approved since their proffered testimony was not relevant to the issues set for hearing at this time."). Finkel's testimony, to the extent it would show bias on the part of Morgan or OSHA against whistleblowers, was relevant to *Carr* factors one and two as it would help to diminish the apparent strength of the agency's case against Whitmore and suggest a retaliatory motive. Finkel's testimony was also offered to discuss threats of violence made by other OSHA officials with no repercussions. This testimony would plainly be relevant under the third *Carr* factor which examines "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr*, 185 F.3d at 1323. Whitmore was entitled to offer this testimony to make his defense and attempt to show that his threats of violence were treated differently than threats made by non-whistleblower OSHA officials.

In sum, we hold that it is an abuse of discretion to categorically exclude all witnesses offered to testify as to evidence under the *Carr* factors on relevance grounds. Doing so prevents whistleblowers from effectively presenting their defenses, and leaves only the agency's side of the case in play. This can have a substantial effect on the outcome of the case, and so constitutes harmful error.

### C. Whitmore's EEO Defense

On appeal, Whitmore contends that the AJ erred by refusing discovery and disallowing witnesses and testimony concerning Whitmore's affirmative defense regarding his participation in the EEO proceedings in 2005. Whitmore claims that he was "unable to procure evidence relevant to this claim in discovery, and was unable to present a full case at the hearing, which would have included evidence, testimony and questioning of other witnesses about his EEO activity and the part it played in his removal." Whitmore Br. at 65. The AJ explained that she understood Whitmore's EEO defense as being "based on the same evidence" as Whitmore's whistleblower defense, and Whitmore has identified nothing that would distinguish the factual bases for the two. A109. Nevertheless, the AJ acknowledged her error after the hearing and offered Whitmore the opportunity to place additional evidence and argument into the record "solely on the [EEO retaliation] issue," the record being closed as to Whitmore's whistleblower defense. A110. It does not appear that Whitmore subsequently attempted to introduce any new evidence regarding his EEO defense, or that any evidence or argument he offered was rejected. Nor does Whitmore present any argument for why submitting evidence or argument post-hearing would have been insufficient to effectively make his EEO defense. In light of the AJ's giving Whitmore a meaningful opportunity to complete the record, and Whitmore's declining to take

advantage of that opportunity, we see no reversible error concerning Whitmore's EEO defense.

### D.  Retaliatory Motive

The AJ found "no evidence" to support a finding of a retaliatory motive, since Witt and Shalhoub were outside Whitmore's chain of command, were not directly implicated in any of Whitmore's whistleblowing, and had only limited knowledge of Whitmore's whistleblowing activity. A21.  The AJ noted in particular that both Witt and Shalhoub denied that Whitmore's whistleblowing disclosures affected their decisions to remove him.

To find zero evidence suggesting any retaliatory motive on this record is to take an unduly dismissive and restrictive view of *Carr* factor two: "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision." *Carr*, 185 F.3d at 1323. Those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees. *See Carr*, 185 F.3d at 1322-23; *Chambers v. Dep't of the Interior*, 116 M.S.P.R. 17, 55 (2011) (finding motive to retaliate because proposing and deciding officials were high level officials and the disclosures "reflected on both of them as representatives of the general institutional interests of the agency"); *Phillips v. Dep't of Transp.*, 113 M.S.P.R. 73, 83 (2010) (finding that comments generally critical of agency's leadership "would reflect poorly on" officials "responsible for monitoring the performance of the field staff and making sure that agency regulations are carried out correctly and consistently").

Various emails in the record show that both Witt and Shalhoub, along with many other OSHA officials, were closely following Whitmore's whistleblowing disclosures and the effect they were having on OSHA in compelling OSHA to remedy the problems disclosed by Whitmore. *See, e.g.*, A524-25 (email from Dubois, copying Goddard, forwarding Dave Schmidt's comments on Whitmore's congressional testimony); A526 (email chain including Goddard and Dubois concerning how to refute Whitmore's congressional testimony); A696-708 (email from Goddard and received by OSHA officials including Dubois, Poogach, Schmidt, and Shalhoub reprinting Charlotte Observer article quoting Whitmore); A715-17 (email to Goddard, Shalhoub and other OSHA officials forwarding article quoting Whitmore entitled "OSHA Turns Blind Eye to Underreporting"); A727 (email from Goddard to OSHA officials attaching article quoting Whitmore, and asking "Can an [sic] current employee on administrative leave go on record in the media, as an agency subject matter expert, discrediting the agency?"); A738-40 (Charlotte Observer article about congressional hearing sent to Witt, Goddard and Dubois, pointing to "Whitmore statements at the end"); A746-47 (email to Witt and Goddard concerning media coverage of issues of underreporting and worker safety on the Bay Bridge, which media coverage quotes Whitmore). This evidence plainly shows awareness and concern regarding the substance of Whitmore's disclosures by many high-level OSHA managers, including Witt and Shalhoub. Whitmore repeatedly cast OSHA and, by implication, all of the responsible OSHA officials, in a highly critical light by calling into question the propriety and honesty of their official conduct.

When a whistleblower makes such highly critical accusations of an agency's conduct, an agency official's merely being outside that whistleblower's chain of com-

mand, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower's disclosure is insufficient to remove the possibility of a retaliatory motive or retaliatory influence on the whistleblower's treatment. Since direct evidence of a proposing or deciding official's retaliatory motive is typically unavailable (because such motive is almost always denied), federal employees are entitled to rely on circumstantial evidence to prove a motive to retaliate. *McCarthy v. Int'l Boundary & Water Comm.*, 116 M.S.P.R. 594, 613 (2011). Thus, "[w]hen applying the second *Carr* factor, the Board will consider any motive to retaliate on the part of the agency official who ordered the action, as well as any motive to retaliate on the part of other agency officials who influenced the decision." *Id.* at 624-25; *see also Phillips*, 113 M.S.P.R. at 82 (same). For example, the Board has held that a "proposing official's strong motive to retaliate may be imputed to a deciding official" in some circumstances. *Chambers*, 116 M.S.P.R. at 48 (citing *Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610, ¶¶ 19–20 (2002)).

Here, the AJ failed to consider the evidence suggesting the existence of a retaliatory motive on the part of OSHA officials aside from Witt and Shalhoub, such as Dubois and Goddard, and the extent to which Witt and Shalhoub might have been influenced by such other OSHA officials. The record as discussed above includes several years' worth of evidence showing a pattern of Whitmore's whistleblowing disclosures followed by adverse personnel actions taken against Whitmore by his direct supervisors. Against this backdrop, Robert Poogach's April 14, 2009 email to David Morgan asks if Witt, who had nothing to do with Whitmore previously, may in fact have been "duped into signing [a removal proposal for] what [other OSHA officials] had long ago decided." A680. Likewise, the Morgan report is alleged to

have been written by Morgan, pursuant to OSHA's desire to avoid the appearance of retaliation, to contain a selective (if not falsified) version of the facts favorable to OSHA. The record contains evidence that supports this view of the circumstances surrounding Morgan's investigation. To the extent Morgan's report reflects and perpetuates retaliatory motives of the OSHA officials with whom Morgan worked and communicated, the report might also have influenced Witt and Shalhoub for purposes of *Carr* factor two.

Under the AJ's reasoning, however, allegations of retaliatory motive in this context can easily be dispelled if the proposing and deciding officials are not directly named in whistleblowing disclosures, are outside of a whistleblower's chain of command, and simply deny having a retaliatory motive. We disagree. This reasoning flies in the face of congressional intent, and is a perfect example of why the agency is expected to carry a "high burden" to prove that Whitmore would have been removed regardless of his whistleblowing. 135 Cong. Rec. H747-48. Whitmore is at a particularly severe evidentiary disadvantage when it comes to proving the state of mind of OSHA officials if a mere denial is sufficient to remove the possibility of retaliatory motive. *See id.* Whitmore also has no control over the identity of the proposing and deciding officials or what documentation is created or maintained, whereas the agency can direct the course of an investigation and advantageously select officials several degrees removed from the whistleblower to help the agency's case withstand judicial scrutiny. *See id.* In this manner the agency can "build" a more defensible case, as Whitmore alleges was done via the removal proposals and the Morgan report.

On this record, it is not unreasonable to suggest that Witt and Shalhoub might have developed or at least been

influenced by retaliatory motives to remove Whitmore. In any event, the AJ clearly erred in finding that "no evidence" in the record supports Whitmore on *Carr* factor two. In fact, this finding is plainly inconsistent with the AJ's prior finding that "the timing of the agency's actual proposal to remove the appellant followed closely enough to the appellant's protected disclosures that one could reasonably conclude that his whistleblowing disclosures were a contributing factor in the agency's removal action." A5.

On remand, the AJ must reconsider the record under a more expansive view of what suffices to evidence the existence or strength of retaliatory motive consistent with this opinion, so that all the pertinent evidence may be properly weighed.

### E.  Similarly Situated Non-Whistleblowers

Absent Finkel's testimony concerning other actions by OSHA officials, the AJ had only Dubois's conduct for comparison to Whitmore's. Whitmore was removed, whereas Dubois faced no disciplinary action. Under *Carr* factor three, which inquires as to "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated," the AJ believed that Dubois was not similarly situated to Whitmore since Whitmore was the instigator and the one who had threatened physical violence. A22; *Carr*, 185 F.3d at 1323. Thus, no meaningful comparison between the action taken against Whitmore and the lack of action against Dubois was made in evaluating Whitmore's whistleblower defense.

Board precedent under *Carr* factor three takes a narrow view of what it means for employees to be "similarly situated." "For other employees to be deemed similarly situated, the Board has held that all relevant aspects of

the appellant's employment situation must be 'nearly identical' to those of the comparative employees." *Spahn v. DOJ*, 93 M.S.P.R. 195, 202 (2003). Regarding the employees' conduct, two employees are not similarly situated if there are "differentiating or mitigating circumstances that would distinguish their misconduct or the appropriate discipline for it." *Godesky v. Dep't of Health & Human Servs.,* 101 M.S.P.R. 280, 285-86 (2006).

We cannot endorse the highly restrictive view of *Carr* factor three adopted by the AJ in this case. One can always identify characteristics that differ between two persons to show that their positions are not "nearly identical," or to distinguish their conduct in some fashion. *Carr*, however, requires the comparison employees to be "similarly situated"—not identically situated—to the whistleblower. To read *Carr* factor three so narrowly as to require virtual identity before the issue of similarly situated non-whistleblowers is ever implicated effectively reads this factor out of our precedent.

Here, Dubois and Whitmore were both in supervisory positions within the same branch of the same department at OSHA. They even operated within the same chain of command. Whitmore and Dubois were similarly situated from an employment position and responsibility perspective. *Compare with Carr*, 185 F.3d at 1327 ("[T]he 'support staff' employees of the New Haven hearing office were not similarly situated to Ms. Carr. Significantly, those employees and the ALJs were supervised under separate chains of command. More importantly, as an ALJ, Ms. Carr held a position of trust and responsibility that was entirely different from the positions of the employees who made complaints about her.") (citations omitted).

In terms of their conduct, regardless of who initiated or escalated the various altercations, the record supports that both Whitmore and Dubois engaged in the same inappropriate and unprofessional conduct and hostility to large degree. The ultimate conditional threat of violence made by Whitmore certainly distinguishes the two, but for the most part Dubois's conduct could well be considered the very same kind of disruptive and intimidating behavior, conduct unbecoming a supervisor, and inappropriate conduct in the workplace for which Whitmore was charged. Dubois yelled, spat, and was openly hostile to Whitmore. Dubois also participated in perpetuating argumentative email threads between himself and Whitmore, copying uninvolved OSHA officials. To the extent Whitmore's conduct was the same as Dubois's, but was more frequent, serious, or unprofessional as a matter of degree, any meaningful *overall* comparison also would have had to weigh the evidence in the record suggesting that Dubois was maliciously tampering with Whitmore's leave totals. Without weighing the evidence ourselves, we simply illustrate that a meaningful comparison between the conduct of Whitmore and Dubois can be made, but was not made in this case.

For purposes of examining *Carr* factor three, the requisite degree of similarity between employees cannot be construed so narrowly that the only evidence helpful to the inquiry is completely disregarded. Differences in kinds and degrees of conduct between otherwise similarly situated persons within an agency can and should be accounted for to arrive at a well reasoned conclusion regarding *Carr* factor three, particularly where, as here, there was only a single person in the record for which a comparison can be made (Finkel's testimony having been excluded). Despite ultimately finding no evidence of similarly situated non-whistleblowers, even the AJ found

Whitmore's contentions concerning Dubois's lack of any disciplinary action to be his "strongest argument in support of his affirmative defense." A21. Yet by deeming Dubois not "similarly situated," the AJ did not examine how the disparity in treatment between Whitmore and Dubois should inform the *Carr* factor three analysis.

The whistleblower statute is clear that even where the charges have been sustained and the agency's chosen penalty is deemed reasonable, the agency must still prove by clear and convincing evidence that it would have imposed the *exact same penalty* in the absence of the protected disclosures. 5 U.S.C. § 1221(e) (providing that the agency must prove it would have taken "the *same personnel action* in the absence of such disclosure") (emphasis added). Perhaps the most helpful inquiry in making this determination is *Carr* factor three, and its importance and utility should not be marginalized by reading it so narrowly as to eliminate it as a helpful analytical tool.

To be clear, *Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh them each individually in the agency's favor. The factors are merely appropriate and pertinent considerations for determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing. *Carr*, 185 F.3d at 1323; *see Kalil v. U.S.D.A.*, 479 F.3d 821, 824 (Fed. Cir. 2007) (noting that "the [b]oard in *Geyer*, identified several factors that *may be considered*, including [the *Carr* factors].") (emphasis added, internal citation omitted). Indeed, the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis. *See, e.g., McCarthy v. Int'l Boundary and Water Comm.: U.S. & Mexico,* 116 M.S.P.R.

594, 626 (2011) (finding no evidence of the agency taking similar actions against similarly situated non-whistleblowers, and therefore concluding that "the third *Carr* factor is not a significant factor for the Board's analysis in the instant appeal"); *Sutton v. Dep't of Justice*, 94 M.S.P.R. 4, 13-14 (2003) (finding that whistleblower was lawfully removed based on the evidence under *Carr* factors one and two, where the record contained no evidence of action taken against similarly situated non-whistleblowers).

To the extent such evidence exists, however, the agency is required to come forward with all reasonably pertinent evidence relating to *Carr* factor three. Failure to do so may be at the agency's peril. As a practical matter, the agency has far greater access to and control over evidence of prior disciplinary action taken against its employees than a whistleblower-employee typically does. The agency should liberally produce this evidence not only because any such evidence in its possession is plainly relevant and discoverable, but also to help the agency carry its overall burden to prove by clear and convincing evidence that the personnel action taken against the whistleblower would have been taken regardless of the whistleblowing. Stated differently, the absence of any evidence concerning *Carr* factor three may well cause the agency to fail to prove its case overall. *See Chambers*, 116 M.S.P.R. at 88 (finding that "we are simply not left with a 'definite and firm conviction' that the agency would have taken any action based on the sustained charges in the absence of her protected disclosures" in large part because the agency "did not show that it took similar actions against similarly-situated non-whistleblowers"); *Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610, 621 (2002) ("[A]lthough the Board of Investigation report provided agency officials with evidence to support taking some

disciplinary action against the appellants, this factor is far outweighed by the strong motive to retaliate by agency officials who were involved in these disciplinary actions and the lack of evidence showing that the agency took similar actions against otherwise similarly-situated non-whistleblowers."); *Russell v. Dep't of Justice*, 76 M.S.P.R. 317, 327-328 (M.S.P.B. 1997) ("Weighing the three factors . . . , we find that although the reporting officials had strong evidence to support their reports concerning the appellant, this factor is far outweighed by their strong motive to retaliate and the lack of any evidence showing that they treated non-whistleblower employees  the same way they treated the appellant.").

On remand, the AJ must reconsider the evidence surrounding Dubois's conduct and lack of any repercussions, along with the testimony of Dr. Finkel, in a manner consistent with the scope of *Carr* factor three as expressed herein.

### F.   Omissions from the AJ's Decision

To reach her conclusions, the AJ focused strictly on the three charges and various specifications against Whitmore surrounding the July 10, 2007 incident, Whitmore's emails, and the sign Whitmore placed on his door. Whitmore's theory below and on appeal, however, is essentially as follows.  Beginning in 2005 when Whitmore's whistleblowing started, the DOL and various managers at OSHA began to systematically create a hostile work environment for him as retaliation, primarily by making his ability to take leave to which he was entitled very difficult, and preventing him from obtaining any relief from other OSHA officials.  Eventually, as intended by the DOL, the stress of this environment caused Whitmore such aggravation that he acted out in various ways against his better judgment.  David Morgan was then

brought in as a hired gun to help build a case that would
withstand legal scrutiny for OSHA's removal of Whit-
more. Witt and Shalhoub were then brought in to create
an appearance of impartiality in the proposing and decid-
ing officials, since they were both outside Whitmore's
chain of command. This admittedly elaborate theory
finds considerable evidentiary support in the record, and
yet virtually none of the key evidence is acknowledged or
alluded to—let alone discussed—in the AJ's decision.
While we do not presume to re-weigh the evidence on
appeal, we must note for the record at least the most
prominent evidence in support of Whitmore's theory that
must be examined and re-weighed on remand pursuant to
the proper clear and convincing evidence standard.

First, while the AJ mentions the longstanding dispute
between Whitmore and Dubois regarding Whitmore's
leave usage and balances, there is no discussion of the
fact that Whitmore's leave totals were shown to be incor-
rect by 75 hours, and that testimony suggested this was
due to Dubois's intentionally and maliciously altering
Whitmore's time sheets. The AJ does not discuss the fact
that a mere two days after Whitmore reported Dubois'
illegal gambling activities using office resources, Dubois
removed Whitmore's rating authority over his subordi-
nates. There is also no discussion of Robert Poogach's
April 14, 2009 email to Dave Morgan indicating his confi-
dence that OSHA can "make the case that [Whitmore's
removal] is not tied to any protected activity," and ques-
tioning whether Witt was simply "duped into signing [a
removal proposal for] what we had long ago decided."
A680. Nor is there any discussion of how OSHA wit-
nesses and their statements were selected and gathered
for Morgan's investigation. The AJ makes no mention of
the fact that, although Morgan's report was purportedly
an independent investigation to assist the DOL in its

disciplinary determination regarding Whitmore, Goddard's initial proposal to remove Whitmore in 2007 was authored two days prior to Morgan's report. Of course, the likely testimony of various witnesses excluded by the AJ was also not discussed because those witnesses never appeared at the hearing.

Perhaps most glaringly absent from the AJ's decision is any serious discussion of the facts and circumstances surrounding how Whitmore's whistleblowing in 2005 marked the beginning of his increasingly strained relationships with OSHA officials, and how his disclosures paralleled his increasingly poor performance reviews and adverse personnel actions after decades of exceptional service. The AJ concluded that for purposes of Whitmore's *prima facie* case of whistleblower retaliation, "the timing of the agency's actual proposal to remove the appellant followed closely enough to the appellant's protected disclosures that one could reasonably conclude that his whistleblowing disclosures were a contributing factor in the agency's removal action." A5. However, this finding and the surrounding facts were never revisited in the context of the agency's burden to prove that it would have taken the same action against Whitmore regardless of his whistleblowing. The AJ did not consider the possibility that the conduct upon which Whitmore's removal was premised might never have occurred but for the DOL's retaliatory actions creating a hostile work environment for Whitmore. In exploring whether the DOL would have removed Whitmore in the absence of his whistleblowing, the AJ must concede this possibility and examine the evidence that supports it. Otherwise, any agency could take retaliatory action against whistleblowers by creating a hostile work environment for the whistleblower until the whistleblower acts out, then lawfully

remove the whistleblower under the pretext of that later conduct.

The AJ thus reasoned through her opinion in a manner that ignores or overlooks essentially all of the evidence offered to support Whitmore's theory, and provides no explanation for why such evidence was inappropriate for consideration, unpersuasive, or otherwise not entitled to any weight. While the DOL urges us to affirm the MSPB's judgment as supported by substantial evidence, absent discussion in the AJ's decision to account for Whitmore's theory and the evidence on which he relies, we cannot meaningfully evaluate whether substantial evidence exists to support the AJ's conclusions. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Simpson v. Office of Pers. Mgmt.*, 347 F.3d 1361, 1364 (Fed. Cir. 2003) (citation omitted). Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence.

While we acknowledge that the AJ may well have considered the countervailing evidence and rejected or discounted it for various reasons, with no basis in her opinion to understand her logic, we cannot say that her analysis is reasonable or complies with the law for how proof by clear and convincing evidence is to be evaluated. *See Li Second Family*, 231 F.3d at 1381; *Price*, 988 F.2d at 1196. Because considerable countervailing evidence was manifestly ignored, overlooked, or excluded, we must vacate and remand for consideration of all the evidence.

\* \* \*

For the foregoing reasons, we conclude that the various determinations and rulings of the AJ were "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 7703(c)(1). We therefore set aside the judgment of the MSPB and remand for further proceedings not inconsistent with this opinion.

## IV. CONCLUSION

The laws protecting whistleblowers from retaliatory personnel actions provide important benefits to the public, yet whistleblowers are at a severe evidentiary disadvantage to succeed in their defenses. Thus, the tribunals hearing those defenses must remain vigilant to ensure that an agency taking adverse employment action against a whistleblower carries its statutory burden to prove—by clear and convincing evidence—that the same adverse action would have been taken absent the whistleblowing.

Despite Robert Whitmore's highly unprofessional and intimidating conduct, which may well ultimately justify some adverse personnel action, he is nevertheless a bona fide whistleblower. Mr. Whitmore is therefore entitled to the full scope of protection afforded by the Whistleblower Protection Act, which ensures for him and whistleblowers everywhere that they need not fear retribution for disclosing to the public such vital information concerning an agency or official as "a violation of any law, rule, or regulation, or . . . gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety . . . ." 5 U.S.C. § 2302(b)(8). Congress decided that we as a people are better off knowing than not knowing about such violations and improper conduct, even if it means that an insubordinate employee like Mr. Whitmore becomes, via such disclosures, more difficult to discipline or terminate. Indeed, it is in the presence of such non-sympathetic employees that commitment to the clear and convincing

evidence standard is most tested and is most in need of
preservation.

## VACATED AND REMANDED