# United States Court of Appeals for the Federal Circuit

---

**TROY W. MILLER,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3149

---

Petition for review of the Merit Systems Protection Board in No. DA-1221-11-0401-W-3.

---

Decided: December 2, 2016

---

DENNIS L. FRIEDMAN, Philadelphia, PA, argued for petitioner.

ROBERT NORWAY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR, ALLISON KIDD-MILLER.

---

Before REYNA, HUGHES, and STOLL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* STOLL.

Concurring opinion filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* HUGHES.

STOLL, *Circuit Judge.*

Troy Miller appeals the decision of the Merit Systems Protection Board denying him relief for a personnel action taken by the Department of Justice. The Board held that Mr. Miller met his burden of showing that certain disclosures he made, found by the Board to be protected under the Whistleblower Protection Act, contributed to his reassignment. The Board further held, however, that the Government successfully rebutted Mr. Miller's prima facie case by showing independent causation for the personnel action. Because the Board's decision is not supported by substantial evidence, we reverse.

BACKGROUND

I.

Mr. Miller worked as the Superintendent of Industries, level GS-13, at the Federal Correctional Complex, Beaumont, Texas. In this capacity, Mr. Miller oversaw a prison factory that produced ballistic helmets primarily for military use. He held significant responsibilities as Superintendent of Industries, including: managing the factory budget; executing contracts with outside suppliers; hiring, training, and overseeing inmate staff; and developing and maintaining production schedules. Performance reviews lauded Mr. Miller for taking the initiative to coordinate delivery schedules with outside vendors—a task normally performed by central office professionals—and for spearheading a business partnership with an outside armor outfitter.

UNICOR, a Government-owned corporation, operated the prison factory, but Mr. Miller worked for the Federal Bureau of Prisons within the Department of Justice, as did his direct supervisor, prison warden Jody Upton. Mr. Miller, along with the associate warden and the warden's captain, served on Warden Upton's executive staff. As a member of the Warden's executive staff, Mr. Miller drafted prison security reports sent to the regional office and responded to security incidents at the Beaumont facility, as well as other correctional facilities. He was also on rotation every six weeks to serve as the prison's acting administrative duty officer and he chaired the Inmate Issues Committee, where he was a conduit between inmates and Warden Upton, relaying inmate concerns to the warden and providing the warden's feedback to the inmates. In Warden Upton's absence, Mr. Miller occasionally filled in as an associate warden. Reflecting on Mr. Miller during his testimony in this case, Warden Upton described Mr. Miller as "a fantastic employee" who was "very on top of things" and with whom he had "absolutely no concerns," a sentiment reflected in Warden Upton's performance evaluations of Mr. Miller. J.A. 90–92.

On October 7, 2009, Mr. Miller disclosed to individuals at UNICOR and to Warden Upton what he perceived to be mismanagement of funds at the factory. Warden Upton testified that he received a phone call in mid- to late-October 2009 from the DOJ Office of Inspector General ("OIG") explaining that there had been reports of impropriety at the factory, but Warden Upton could not recall with whom at OIG he spoke. On December 15, 2009, OIG conducted an on-site visit to the factory as part of an investigation into the factory's operations and purported misconduct. Warden Upton asked Mr. Miller to not report to the factory on that day, relaying to him that the investigators did not want the factory staff to feel

uncomfortable or intimidated by having their supervisor, Mr. Miller, present during the OIG visit.

On December 16, 2009, the day following OIG's factory visit, Mr. Miller reported to Warden Upton and others that there had been a "sabotage" at the factory, with rejected Kevlar® material having been placed on the production line. J.A. 162. Mr. Miller testified that constructing a helmet using rejected material would seriously compromise the helmet's ability to withstand projectile impact and thus would endanger the lives of soldiers outfitted in such helmets. Mr. Miller testified that "why I did what I did is there's a U.S. Marine's life at the end of this helmet, period. And it is my responsibility as a superintendent of industries when I see anything that is wrong, to report it immediately and to stop production." J.A. 276. Mr. Miller urged that the factory be closed pending an investigation of the alleged factory sabotage.

Several hours after the sabotage disclosure, Warden Upton informed Mr. Miller that he was being reassigned from the factory and would no longer serve as Superintendent of Industries. Without identifying any specific individual, Warden Upton testified that some person or persons working for OIG had directed him to reassign Mr. Miller. OIG had become concerned, testified Warden Upton, that Mr. Miller might compromise its investigation by remaining at the factory. Warden Upton testified that because Mr. Miller did not "technically work for me in the operational aspect, I contacted UNICOR's central office, as well as my regional director" and "[a] decision was made the following day that [Mr. Miller] would need to be removed from the factory." J.A. 101. Warden Upton further testified that, at some point later, OIG "made it clear that Mr. Miller was actually one of the subjects of the investigation," although he could not recall during his testimony when OIG disclosed this information to him. J.A. 99.

Over the next four and a half years, Mr. Miller was assigned to various lower-level positions which, unlike the Superintendent of Industries position, were not on the Warden's executive staff.[1] Mr. Miller's various duties, during the times when he was assigned work, included: monitoring inmate phone calls for criminal activity; assisting with the prison's food service by wiping tables and observing inmates as they cleaned floors; performing clerical work, such as shredding documents; and working the night shift in the special housing unit.[2] Warden Upton testified that he moved Mr. Miller from one assignment to the next several times at the behest of OIG. Warden Upton testified that OIG began to fear that placing Mr. Miller in any position with inmate exposure presented a threat to the investigation. For example, Warden Upton testified that OIG believed Mr. Miller had been conversing with inmates during his food service detail and that Mr. Miller chose to monitor the phone calls of inmates who worked in the factory during his phone detail, which the Warden's staff was able to find some supporting correlative evidence of by examining phone records. Warden Upton again did not reveal the identity of any specific OIG employee with whom he spoke

---

[1] Warden Upton testified that the prison helmet factory closed somewhere between August and September 2011, nearly two years after Mr. Miller was initially reassigned out of the helmet factory. Mr. Miller received notification that he was being permanently reassigned from the Superintendent of Industries position to the position of Camp Administrator because of the factory closing.

[2] Mr. Miller testified that the night shift was not desirable, and that he had not previously worked in the special housing unit.

or provide OIG's specific justification for fearing that Mr. Miller would threaten the investigation.

Eventually, Warden Upton reassigned Mr. Miller out of the medium-security prison facility altogether and to an administrative building on the prison premises. While there, Mr. Miller was told to sit on a couch in the building lobby without being given any work to perform, which he did for eight months. He later received an office, but continued to have no work assigned to him. He remained on the GS-13 payscale all the while, yet Warden Upton testified that putting him in these positions was "absolutely" a waste of his talents.

## II.

Mr. Miller brought an individual right of action ("IRA") appeal to the Board, alleging that the DOJ's actions against him violated the Whistleblower Protection Act ("WPA"). Particularly, Mr. Miller asserted that he made protected whistleblower disclosures under 5 U.S.C. § 2302(b)(8) and that they contributed to his effective reassignment out of the Superintendent of Industries position, which he contended was a personnel action under 5 U.S.C. § 2302(a)(2)(A). Mr. Miller claimed as protected his October 2009 fund-mismanagement disclosure and his December 2009 factory-sabotage disclosure.

The Administrative Judge agreed with Mr. Miller that both his October 2009 and December 2009 disclosures were protected under § 2302(b)(8). The A.J. also found that, applying the 5 U.S.C. § 1221(e)(1) "knowledge/ timing" test, Mr. Miller's disclosures contributed to his reassignment, which the A.J. found to be a personnel action under § 2302(a)(2)(A). Because the A.J. found that Mr. Miller made a protected disclosure and suffered an adverse personnel action, the burden shifted to the Government to show by clear and convincing evidence that it would have reassigned Mr. Miller regardless of his protected disclosures. The A.J. found that the Government

met this burden. The A.J. relied almost entirely on testimony from Warden Upton in reaching this finding. The Government had also presented one of Mr. Miller's supervisors at UNICOR, Brad Beus, as a witness, but the Government presented no testimony or documentary evidence from OIG, the group Warden Upton testified directed him to reassign Mr. Miller.

Mr. Miller petitioned the full Board for review of the A.J.'s decision. The Board affirmed the A.J.'s initial decision, and it became the Board's final decision. Mr. Miller appeals to us, and we have jurisdiction under 5 U.S.C. § 7703(a)(1), (b)(1).

DISCUSSION

I.

IRA appeals brought under the WPA operate in a burden-shifting framework. The burden lies with the employee to show "by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that was a contributing factor to the employee's [personnel action]." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012) (citing 5 U.S.C. § 1221(e)). "If the employee establishes this prima facie case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure,'" *id.* (quoting § 1221(e)), which we sometimes refer to as a showing of "independent causation," *see, e.g.*, *Kewley v. Department of Health & Human Services*, 153 F.3d 1357, 1364 (Fed. Cir. 1998).

In evaluating whether the Government has successfully rebutted an employee's prima facie case by demonstrating independent causation, this court has approved of the use of three, albeit nonexclusive, factors described

in *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999):

> [1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

But, "[t]o be clear, *Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh them each individually in the agency's favor." *Whitmore*, 680 F.3d at 1374. Rather, "[t]he factors are merely appropriate and pertinent considerations for determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing." *Id.*

By statute, we set aside the judgment of the Board if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *see also Whitmore*, 680 F.3d at 1366.

## II.

The Government does not dispute the Board's threshold determination that Mr. Miller made a prima facie showing that his disclosures were WPA-protected and that they contributed to his reassignment. Thus, the burden shifted to the Government to show independent causation. The issue before us is whether substantial evidence supports the Board's determination that the

Government showed independent causation by clear and convincing evidence. We conclude that it does not.

A. Burden of Proof and Standard of Review

Independent causation is established upon clear and convincing evidence. "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988)); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1983). The clear and convincing burden of proof "imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt." *Id.* (citing *Buildex*, 849 F.2d at 1463).

We have explained before that "there is no doubt that Congress considered it very important that federal agencies be required to clearly and convincingly rebut a prima facie case of whistleblower retaliation," while quoting legislative history that describes the significance of the Government's burden:

> "Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action—in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards— the drafting of the documents supporting the decision, the testimony of witnesses who participated

in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.

*Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)).

We review the Board's finding of independent causation for substantial evidence. *Kewley*, 153 F.3d at 1364. "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Jacobs v. Dep't of Justice*, 35 F.3d 1543, 1546 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). "Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence." *Whitmore*, 680 F.3d at 1376.

This court's prior opinions recognize the interrelatedness of the burden of proof a party must satisfy to win its case—here, clear and convincing evidence—and our standard of appellate review—substantial evidence in this instance. The burden of proof a party faces necessarily impacts our review on appeal:

Substantial evidence is not a fixed quantum of evidence: What is or is not substantial may only be determined with respect to the burden of proof that the litigant bore in the trial court. "For example, in reviewing whether the evidence supports a finding of fact . . . the decision might be affirmed if the standard of proof below were

'weight of evidence' and might be reversed on the same record if the standard of proof were 'clear and convincing' evidence."

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004) (omission in original) (quoting *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n,* 718 F.2d 365, 383 (Fed. Cir. 1983) (Nies, J., additional comments)); *see also Jackson v. Veterans Admin.*, 768 F.2d 1325, 1330 & n.5 (Fed. Cir. 1985).  Indeed, our prior WPA decisions consistently describe the clear and convincing evidentiary burden as embedded within our substantial evidence appellate review.  *See, e.g.*, *Greenspan v. Dep't of Veterans Affairs*, 464 F.3d 1297, 1306 (Fed. Cir. 2006) ("We have not been shown *substantial evidence* in support of the agency's burden to establish *by clear and convincing evidence* that it would have taken these disciplinary actions absent the protected disclosures." (emphases added)).[3]

---

[3]     *See also Briley v. Nat'l Archives & Records Admin.*, 236 F.3d 1373, 1381 (Fed. Cir. 2001); *Agoranos v. Dep't of Justice*, 602 F. App'x 795, 805 (Fed. Cir. 2015); *Losada v. Dep't of Def.*, 601 F. App'x 940, 943 (Fed. Cir. 2015); *Cassidy v. Dep't of Justice*, 581 F. App'x 846, 847 (Fed. Cir. 2014); *McCarthy v. Int'l Boundary & Water Comm'n*, 497 F. App'x 4, 14 (Fed. Cir. 2012); *Porzillo v. Dep't of Health & Human Servs.*, 369 F. App'x 123, 127 (Fed. Cir. 2010); *Wadhwa v. Dep't of Veterans Affairs*, 353 F. App'x 435, 438 (Fed. Cir. 2009); *Pedeleose v. Dep't of Def.*, 343 F. App'x 605, 609–10 (Fed. Cir. 2009); *King v. Dep't of Veterans Affairs*, 276 F. App'x 996, 998 (Fed. Cir. 2008); *Dennis v. Dep't of Veterans Affairs*, 191 F. App'x 961, 964 (Fed. Cir. 2006); *Tomei v. Dep't of Educ.*, 113 F. App'x 920, 923 (Fed. Cir. 2004); *Kraushaar v. Dep't of Agric.*, 60 F. App'x 295, 298 (Fed. Cir. 2003); *Meyers v.*

## B. *Carr* Factor Analysis

With this background in mind, we review the Board's analysis of the *Carr* factors.

The first *Carr* factor is "the strength of the agency's evidence in support of its personnel action." *Carr*, 185 F.3d at 1323. We do not focus our review of this *Carr* factor on whether the agency has put forward some evidence purporting to show independent causation, but instead we focus on whether such evidence is strong. *See id.* at 1323–24. The Board in this case relied nearly exclusively on Warden Upton's testimony to conclude that this factor weighed in the Government's favor. A considerable amount of the relied-on testimony consisted of Warden Upton's recollection of things OIG told him. We hold that no reasonable factfinder could find Warden Upton's conclusory testimony about how OIG directed him to be strong evidence of independent causation.[4] Thus, this *Carr* factor could not favor the Government as the Board concluded.

---

*Dep't of Veterans Affairs*, 33 F. App'x 523, 527 (Fed. Cir. 2002); *Maston v. Dep't of Justice*, 10 F. App'x 937, 942 (Fed. Cir. 2001); *Beadling v. Dep't of Justice*, 4 F. App'x 798, 801 (Fed. Cir. 2001); *Gray v. Dep't of Interior*, 250 F.3d 763 (Fed. Cir. 2000) (non-precedential); *Bristow v. Dep't of Army*, 232 F.3d 908 (Fed. Cir. 2000) (non-precedential).

[4] The parties disagree as to whether such testimony constitutes hearsay or, rather, whether it falls within a hearsay exception. We find that resolving this dispute bears little on the ultimate issue. Hearsay may be admitted as preponderant evidence in Board proceedings "if, to a reasonable mind, the circumstances are such as to lend it credence." *Kewley*, 153 F.3d at 1364.

The Government and the dissent rely on three pieces of allegedly substantial evidence of a strong showing of independent causation: (1) Warden Upton's testimony that he took action because OIG told him Mr. Miller might interfere with the investigation; (2) Mr. Miller's testimony that Warden Upton told him that OIG told the Warden to reassign Mr. Miller; and (3) Warden Upton's testimony that he continued to reassign Mr. Miller because OIG told him that Mr. Miller was interfering with the investigation. Dissent 3–4. But Warden Upton's conclusory testimony about OIG's statements is not made more sufficient or clear and convincing simply by being repeated several times. Indeed, this evidence all collapses into essentially supporting the same basic conclusion— OIG told Warden Upton to reassign Mr. Miller because he might interfere with the investigation. The Government's evidence is weak, particularly when considered in light of the record evidence endorsing Mr. Miller's character.

The Government introduced no evidence to explain how Mr. Miller, whose second protected disclosure related to the OIG investigation, could either compromise or be a target of an investigation into the very type of activities that he reported. To the contrary, the only evidence regarding Mr. Miller's character was his "outstanding" performance review and Warden Upton's testimony that Mr. Miller was "a fantastic employee" who was "confident, organized, . . . [and] very on top of things." J.A. 90–92. Warden Upton further testified that Mr. Miller "[w]as willing to do anything that you asked him to do" and that he "sought out additional duties." Warden Upton testified that he had "absolutely no concerns" about Mr. Miller, "a very good employee" who served on his executive staff, and Warden Upton testified that he had no reason to place him under investigation. *Id.* To reach the conclusion the Government suggests—that OIG directed the reassignment of Mr. Miller to various menial jobs and ultimately the couch for four and a half years for fear that

he would interfere with an investigation allegedly targeting him—a reasonable fact finder would have to conclude that Mr. Miller made his protected disclosures of mismanagement as part of a cover-up. The record is devoid of any evidence supporting such a theory. To the contrary, the record demonstrates that Mr. Miller was a twenty-one-year employee of the Federal Bureau of Prisons and former U.S. Marine who was concerned about the quality of the advanced combat helmets manufactured by the prison factory. The record further demonstrates that Mr. Miller was a valued executive, whose expertise and attention to detail made his product line one of the most successful in the Agency.

Warden Upton's testimony was the only evidence supporting the seemingly unusual basis for Mr. Miller's four-and-a-half year reassignment following his protected disclosures. Yet the Warden could not testify as to significant details, such as who at OIG he communicated with. The Government failed to present any other witness testimony to support its argument that Mr. Miller was removed out of concern that he might somehow interfere with the OIG investigation. Mr. Beus—who was Mr. Miller's supervisor at the Government-owned corporation that operated the factory, UNICOR—was the Government's only other witness and he did not corroborate Warden Upton's testimony. While Mr. Beus testified about Mr. Miller's protected disclosures and the OIG investigation generally, his only testimony regarding Mr. Miller's reassignment was that he had no input into the reassignment decision. J.A. 501–02 ("Q: Okay. So did you have any input in Mr. Miller being removed from his position as [Superintendent of Industries] on that day? A: No."). He did not testify as to who made the reassignment decision or for what reason.

The Government also failed to present any documentary evidence supporting its position. Mr. Miller was repeatedly reassigned over the course of a four-and-a-half

year period, and for each step, the Government did not present a single email, memorandum, or personnel action form documenting or providing the bases for the agency's action. Common sense tells us that these repeated reassignments, occurring over a significant span of time, are the types of personnel actions for which papers would normally attach.

To be clear, we do not hold today that testimony must be corroborated to support a showing of independent causation, although that is one of potentially many ways that the Government could have made its weak evidentiary showing stronger in this case. Likewise, we do not accept Mr. Miller's invitation to view Warden Upton's testimony as not credible. *See Chambers v. Dep't of Interior*, 515 F.3d 1362, 1370 (Fed. Cir. 2008) (holding the Board's "credibility determinations are 'virtually unreviewable' at this level" (quoting *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986))). But even taking the Warden's testimony at face value, we conclude that his bare testimony about what OIG directed him to do affords only minimal support for Mr. Miller's removal when considered in light of the remainder of the record in this case, including the Board's unchallenged findings that Mr. Miller made protected disclosures, that those disclosures contributed to his removal, and that Mr. Miller was by all accounts an outstanding employee. Without introducing any other testimony or documentary evidence—for example, from OIG, the group that the Warden testified, *see* J.A. 118, and the Government concedes, *see* Oral Argument at 37:32–55, drove the December 2009 reassignment decision—there is a significant weakness in the quantum of the Government's evidence going towards the first *Carr* factor. By pointing to the lack of corroboration, the dearth of documents, emails, or records, and even the lack of detail in Warden Upton's recollection, we are not assessing Warden Upton's credibility. Rather, we are doing precisely

what our review of this *Carr* factor demands: assessing
whether a factfinder could reasonably conclude that the
Government presented strong evidence of independent
causation. We conclude that one could not and that this
factor, therefore, could not cut in the Government's favor
as the Board found.

The second *Carr* factor is "the existence and strength
of any motive to retaliate on the part of the agency offi-
cials who were involved in the decision." *Carr*, 185 F.3d
at 1323. The A.J. found that Warden Upton had "little or
no motive to retaliate against" Mr. Miller. J.A. 136. In
reaching this conclusion, the A.J. relied on the fact that
Warden Upton did not exercise direct oversight over the
factory and the Warden's testimony that it did not matter
much to him whether the factory turned a profit.

While the Board's analysis of this factor was reasona-
ble, we note that the Warden testified that he did, in fact,
have an interest in the ongoing operation of the prison
factory to keep inmates "out of trouble" and occupied,
instead of sitting around for months at a time. The
Warden also testified that a possible shutdown of the
factory would "create concern," because "you have to
figure out how that fits into your daily operational plan."
J.A. 116–17. And regarding the A.J.'s reliance on the
Warden's lack of direct factory oversight, we have previ-
ously admonished the Board for taking a dismissive
approach to the retaliatory motive *Carr* factor merely
because a supervisor isn't directly involved in the work at
issue in an employee's protected disclosure. In *Whitmore*,
the A.J. found no evidence that the removing officials had
a retaliatory motive against the employee because they
were outside of his chain of command and were not impli-
cated by his whistleblowing. 680 F.3d at 1370–71. We
found that this analysis took "an unduly dismissive and
restrictive view of *Carr* factor two," *id.* at 1370, and
remanded with instructions for broader consideration of
this factor, *id.* at 1372. We explained that "[t]hose re-

sponsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees." *Id.* at 1370 (citations omitted).

We also find it concerning that the A.J. made a finding regarding Warden Upton's retaliatory motive, but none regarding OIG's motive. The precise language from *Carr* makes clear that this factor should be evaluated more generally, as the factor is directed towards "agency officials who were involved in the decision," not just the employee's direct supervisor. *Carr*, 185 F.3d at 1323; *see also Whitmore*, 680 F.3d at 1371 ("[A]n agency official's merely being outside that whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower's disclosure is insufficient to remove the possibility of a retaliatory motive or retaliatory influence on the whistleblower's treatment."). Considering that, in this case, it was OIG that purportedly directed the Warden to reassign Mr. Miller, it would seem important in this case to examine whether one could impute a retaliatory motive to OIG.

Given these considerations, the evidence for this factor does not unfailingly support the Government. Nonetheless, given the Warden's testimony that he had no reason to be concerned about the factory's profits, the Board's conclusion that this factor ultimately tips in the Government's favor is reasonable.

The third and final *Carr* factor is "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr*, 185 F.3d at 1323. The A.J. found that there was no basis for evaluating this factor because Warden Upton testified that no other similar investiga-

tions involving members of his executive staff occurred during his tenure as Warden.

The Government took an exceedingly narrow approach in addressing this factor. The Warden's testimony shows there to be a lack of similarly situated non-whistleblowers only at the Beaumont prison facility working on the Warden's four-member executive staff specifically and only during his tenure there. The Government introduced no evidence as to what actions it takes against other DOJ employees during OIG investigations despite this factor being directed to the "agency" rather than to a particular supervisor at a particular Federal Bureau of Prisons facility. It may be the case that the DOJ transfers employees pending investigation by OIG with some regularity, but the Government has put forward no evidence of that here. The Government provided no evidence that the treatment of Mr. Miller is comparable to similarly situated employees who are not whistleblowers, and the court may not simply guess what might happen absent whistleblowing. The burden lies with the Government.

The Government bears the risk associated with having no evidence on record for this factor. For while we have indicated that "the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis," we further explained that the Government's failure to produce evidence on this factor "may be at the agency's peril" considering the Government's advantage in accessing this type of evidence. *Whitmore*, 680 F.3d at 1374 (internal citations omitted). Indeed, "the absence of any evidence concerning *Carr* factor three may well cause the agency to fail to prove its case overall." *Id.* Thus, this factor adds little to the overall analysis in this case, but if anything, tends to cut slightly against the Government.

Considering the record as a whole, we are struck by the want of evidence presented by the Government to show independent causation. Although the Government adduced some evidence for *Carr* factor two, the strength of its independent causation evidence (*Carr* factor one) was weak, and it adduced no evidence whatsoever for *Carr* factor three. While we again recognize that the Government need not introduce evidence for each *Carr* factor, or prove that each weighs in its favor to meet its burden, *id.*, we cannot say that substantial evidence supports a finding that the Government clearly and convincingly proved independent causation in this case. The Government must do more than it did here to satisfy the "high burden of proof" that Congress demanded in cases where the employee has already shown that whistleblowing was a contributing factor and the burden shifts to the Government to show independent causation. *Id.* at 1367 (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). Thus, we conclude that there is not substantial evidence to support the Board's determination that the Government proved by clear and convincing evidence that it would have reassigned Mr. Miller even in the absence of his protected disclosures.

Contrary to the dissent's suggestion, we do not hold that Warden Upton is not credible or that his testimony requires corroboration as a matter of law. Nor have we reweighed the evidence. The dissent accuses our opinion of having a breadth that it simply does not have. We merely hold that, in this case, there is a failure of proof because the Government did not meet its burden. Congress instituted a particular statutory framework for analyzing whistleblower cases, including a heightened burden of proof once the whistleblower has established by a preponderance of the evidence that whistleblowing was a contributing factor in a personnel action. "This heightened burden of proof required of the agency recognizes

that when it comes to proving the basis for an agency's decision, the agency controls most of the cards—the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases." *Id.* Here, there is a dearth of evidence establishing independent causation: no testimony other than Warden Upton's conclusory testimony, no documents whatsoever supporting the agency's action, and no records to document similar actions in other cases.

The dissent also alleges that we fail to "cite to a single piece of affirmative evidence that Mr. Miller was reassigned for whistleblowing." Dissent 10. But the dissent wholly ignores what the Board already found and the Government does not dispute on appeal: Mr. Miller "made protected disclosures under 5 U.S.C. § 2302(b)(8) that were a contributing factor in the decision to reassign him." *Miller v. Dep't of Justice*, No. DA-1221-11-0401-W-3, 2015 WL 1548991 (M.S.P.B. Apr. 8, 2015). Thus, our review is strictly limited to whether the Government met its steep burden to show independent causation guided by the *Carr* factors, in which the dissent fails to ground its discussion.

Finally, the dissent accuses our opinion of failing "to appreciate the impact of [this] decision on the agency" and Warden Upton[5] because the agency likely will be required

---

[5]    The dissent asserts that harm will come to Warden Upton as a result of our decision. We reiterate, however, that we do not question Warden Upton's veracity. We simply conclude that, given the other evidence of record, the Government's sole reliance on his conclusory and unsupported testimony was not enough to satisfy the Government's burden.

to report this case to Congress. Dissent 10. But sympathy for the agency does not bear on the question before us. The statutory framework this court must follow requires us to consider whether a reasonable fact finder could find the Government met its "heavy burden to justify its actions" after the employee had already established that whistleblowing was a contributing factor in the action. *Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). We conclude that, in this case, one could not.

## CONCLUSION

For the foregoing reasons, we reverse the Board's decision and remand for further proceedings including determination of the remedy appropriate for the improper personnel action.

**REVERSED AND REMANDED**

## COSTS

Costs to Petitioner.

# United States Court of Appeals
# for the Federal Circuit

---

**TROY W. MILLER,**
*Petitioner*

v.

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3149

---

Petition for review of the Merit Systems Protection Board in No. DA-1221-11-0401-W-3.

---

REYNA, *Circuit Judge*, concurring.

I concur with the majority opinion. I write separately to elaborate on why the Board erred in evaluating the second *Carr* factor: "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision." *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Warden Upton testified that Mr. Miller was "a fantastic employee" whom he reassigned only because OIG directed him to do so. Thus, not only was OIG "involved in the decision," but the record suggests that OIG—not Warden Upton—was the *de facto* decisionmaker here.

A "Cat's Paw" theory applies when an individual with knowledge of the protected disclosure influences another

official to reassign the employee. Thus, the official making the reassignment is simply channeling the wishes of the *de facto* decisionmaker. We have not addressed the Cat's Paw theory in a published whistleblower decision, but the Supreme Court addressed it in a different context, writing, "[I]f a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" under the relevant statute. *Staub v. Proctor Hosp.*, 562 U.S. 411, 424 (2011). Here, Warden Upton performed an act intended to cause an adverse employment action but insists that he was following OIG's orders. Given Warden Upton's positive reviews of Mr. Miller's job performance, it seems unlikely that he would have reassigned Mr. Miller absent OIG's influence. Yet the Board never questioned whether OIG in fact directed Mr. Miller's reassignment or its motivation for doing so. *See* J.A. 126–27 (evaluating only Warden Upton's retaliatory motive).[1]

In *Whitmore v. Department of Labor*, 680 F.3d 1353 (Fed. Cir. 2012), we noted that once an employee makes a prima facie case, the Board is not limited to evaluating the retaliatory motives of agency officials directly in the whistleblower's chain of command. *Id.* at 1371. Instead, the Board should consider the possible retaliatory motives

---

[1]    The dissent implies that Mr. Miller has waived a Cat's Paw theory argument. But the Board's failure to evaluate OIG's role in Mr. Miller's reassignment lends further support that its decision was not supported by substantial evidence. *See Jones v. Dep't of Justice*, 35 F.3d 1542, 1546 (Fed. Cir. 1994) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

of any official who appears to have influenced the adverse employment action. Thus, at minimum, I would remand for the Board to determine OIG's role and motivation in Mr. Miller's reassignment in the first instance.

The dissent questions what OIG's possible retaliatory motive could be in light of OIG's role to protect whistle-blowers. But answering that question is not Mr. Miller's burden. The parties agreed that Mr. Miller made a prima facie case, thus shifting the burden to the Government to show independent causation by clear and convincing evidence. As the majority opinion notes, it failed to do so. The Government's failure to explain OIG's obvious role in Mr. Miller's reassignment only highlights the lack of clear and convincing evidence of independent causation.

# United States Court of Appeals
# for the Federal Circuit

---

**TROY W. MILLER,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3149

---

Petition for review of the Merit Systems Protection Board in No. DA-1221-11-0401-W-3.

---

HUGHES, *Circuit Judge*, dissenting.

In a whistleblower case where an employee makes a prima facie case of whistleblower reprisal, the burden shifts to the agency to prove by clear and convincing evidence that it took the adverse action for a reason other than whistleblower reprisal. Whether the agency had a non-retaliatory reason is a factual determination, which we review for substantial evidence. Here, the Board made that factual determination relying largely on the unrebutted, credible testimony of Warden Upton, the agency official responsible for taking the adverse action. As Warden Upton testified, and the Board found, Mr. Miller was reassigned to other job duties at OIG's request so as not to interfere with an official investigation.

The majority nowhere suggests that this reason, if true, would have been insufficient to satisfy the agency's burden. Nor does the majority anywhere directly question Warden Upton's credibility, or his testimony that Mr. Miller's interference with the investigation was the actual reason for the reassignment. Thus, the majority's reasoning would seem to lead to the following conclusions: first, the deciding official credibly testified that the reason he took the adverse action was at OIG's request; second, the majority has no reason to question this testimony or overturn the Board's implicit credibility determination that the official testified truthfully; and third, the reason given—Mr. Miller's interference with the investigation— would have met the clear and convincing evidence standard if true. These three conclusions, which can all be gleaned from the majority's opinion, require us to affirm.

Instead the majority concludes, on some undefined notion of substantial evidence, that there should be "more" here. Specifically, the majority states that the lack of "any other testimony or documentary evidence— for example, from OIG" presents a "significant weakness" in the Government's case, Maj. Op. at 15, and that the "Government must do more than it did here to satisfy the 'high burden of proof'" that is required in whistleblower reprisal cases, *id.* at 19. But substantial evidence requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and the Board's factual conclusions, each of which is supported by substantial evidence, would be sufficient for a reasonable person to conclude that Mr. Miller was reassigned for reasons independent of whistleblower reprisal.

Thus, there are only three possible explanations for the majority's conclusion, all of which conflict with this Court's precedent.

The first and most likely explanation is that the majority simply disregards our deferential standard of review. The majority reaches beyond our deference standard to re-weigh the evidence and conclude that "given the other evidence of record, the Government's sole reliance on [Warden Upton's] conclusory and unsupported testimony was not enough to satisfy the Government's burden." Maj. Op. at 20 n.5. The majority appears to base its heightened review standard on the argument that we must take the underlying burden of proof—clear and convincing evidence—into consideration in our review on appeal, *id.* at 8–10, and goes so far as to say that our "focus" is "on whether [the agency's evidence purporting to show independent causation] is strong," *id.* at 12. I do not dispute that we must take into account the Government's burden to show independent causation by clear and convincing evidence. However, this does not transform our assessment into a de novo review, and our precedent does not dictate that this Court's standard of review is to assess the strength of the agency's evidence de novo. *See Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323–24 (Fed. Cir. 1999) (noting that the Board, not this Court, considers the strength of the agency's evidence in support of its personnel action). Rather, established precedent dictates that we are only tasked with evaluating whether a reasonable fact finder could have arrived at the Board's determination that Mr. Miller was reassigned for reasons independent of his protected disclosures. *See In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (the substantial evidence standard "asks whether a reasonable fact finder could have arrived at the agency's decision").

Ample evidence exists to support the Board's factual finding that the agency demonstrated, by clear and convincing evidence, that the reason for Mr. Miller's reassignment was to prevent him from interfering with an OIG investigation. First, of course, is the consistent and credible testimony of Warden Upton, the deciding official

who took the action. *See, e.g.*, J.A. 542–45 (Warden Upton testifying that OIG asked him to reassign Mr. Miller because of the investigation). Second is Mr. Miller's own testimony about the reason for the reassignment. *Id.* at 273 (Mr. Miller testifying that Warden Upton told him to leave the factory on December 15, 2009, due to the OIG investigation); *id.* at 283 (Mr. Miller testifying that Warden Upton told him he was being reassigned on December 16, 2009, because Miller had purportedly sent an email to the staff urging them not to cooperate with the OIG investigation). And, third is the fact that Mr. Miller had to be reassigned to other positions within the Bureau of Prisons because he did, in fact, continue to attempt to interfere with the investigation. *Id.* at 546–50 (Warden Upton testifying that Mr. Miller was removed from subsequent positions because he had conversations with inmates and monitored calls to gain information about the investigation). Although a different fact-finder might not have believed Warden Upton or the agency's account, we are not permitted to re-weigh or recharacterize the evidence as the majority does. *See* Maj. Op. at 13–14 (concluding that there is no evidence that Mr. Miller could either compromise or be a target of an investigation that his protected disclosure related to).

Second, even as the majority denies that it is questioning Warden Upton's credibility, it essentially determines that his testimony is insufficient and the reasons he gave for the reassignment are not the truth. That, of course, we cannot do. *See Hambsch v. Dep't of the Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986) (credibility determinations are "virtually unreviewable"). There is no evidence to suggest that Warden Upton lied about his rationale for reassigning Mr. Miller. Warden Upton consistently testified that he reassigned Mr. Miller due to the pending OIG investigation and at OIG's request. The Board was never presented with contrary testimony. The majority faults Warden Upton's testimony for his failure

to "testify as to significant details, such as who at OIG he communicated with." Maj. Op. at 14. But the majority fails to consider that Warden Upton testified about Mr. Miller's reassignment more than four years after the reassignment took place. And, in any event, the fact that Warden Upton could not remember those details goes to the credibility of his testimony, which is a question for the Board and not for us. The majority also neglects to take into account that Mr. Miller himself testified that Warden Upton explained to him on multiple occasions that he was being reassigned because of the OIG investigation. *See, e.g.*, J.A. 273, 283. The majority has to find a lack of substantial evidence to support the Board's factual finding, and cannot premise its decision on its own belief that something more happened here. *See Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1364 (Fed. Cir. 1998) (affirming the finding of independent causation by looking only to the evidence "expressly relied upon by the AJ [Administrative Judge]").[1]

---

[1] At times, the majority appears to suggest that, even if Warden Upton was telling the truth, the agency also was required to demonstrate that OIG had a clear and convincing non-retaliatory reason for requesting the reassignment. *See* Maj. Op. at 17. ("We also find it concerning that the A.J. made a finding regarding Warden Upton's retaliatory motive, but none regarding OIG's motive."). But that type of "Cat's Paw" theory, *see, e.g., Howard v. Dep't of Transp.*, 511 F. App'x 984, 987 (Fed. Cir. 2013) (rejecting petitioner's theory that an individual with knowledge of a protected disclosure exerted influence on the managerial official who terminated the petitioner's employment), was not presented to the Board or to this Court.

The third, and perhaps the most damaging explanation for the majority's opinion, is that it has *sub silentio* imposed a corroboration requirement for a deciding official's testimony. Even though the majority denies that it is doing so or even that it is questioning Warden Upton's credibility, I can think of no other explanation for its criticisms that Warden Upton's testimony was the "only evidence supporting the seemingly unusual basis for Mr. Miller's four-and-a-half-year reassignment,"[2] and "[t]he Government failed to present any other witness testimony to support its argument that Mr. Miller was removed out of concern that he might somehow interfere with the OIG investigation." Maj. Op. at 14. The majority also suggests that there would have been documentation of repeated reassignments. *Id.* at 14–15. The majority's "common sense" speculation is unfounded and inconsistent with federal personnel law. Official personnel documents are generated for changes in grade, pay, official duty station and the like, not temporary reassignments. Contrary to the majority's assertion, I would not expect any kind of official documentation to exist for Mr. Miller's reassignments which did not involve a change in position, pay or official duty station. *See* United States Office of Personnel Mgmt., Guide to Processing Personnel Actions (2016), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/personnel-documentation/#url=Processing-Personnel-Actions.

---

[2]    And I fail to see what is "unusual" about a reassignment decision made to cooperate with an OIG investigation. Surely, the majority is not suggesting that agencies refuse to cooperate with the Inspector General. And if "unusual" refers to the length, I see nothing in the record to suggest that 4.5 years is an "unusual" length of time for an OIG investigation.

The majority's use of a corroboration requirement is the only explanation that would suffice for it to hold that a deciding official's credible testimony is insubstantial or false. There is no one with better firsthand knowledge to testify about the reasons for a personnel action than the person responsible for taking it. Warden Upton was indisputably Mr. Miller's direct supervisor and had the authority to reassign him. While an agency official could certainly lie about his or her decision to reassign an employee, that is largely a credibility determination for the Board to make. And, the majority appears to concede that Warden Upton, the agency official in this case, provided credible testimony. *See* Maj. Op. at 15.

The majority's erroneous findings are further highlighted through its conclusion that Warden Upton's "bare testimony about what OIG directed him to do affords only minimal support for Mr. Miller's removal" in light of other evidence. *Id.* This other evidence includes the Board's "unchallenged findings" that Mr. Miller made protected disclosures that contributed to his removal, and Mr. Miller's record as an "outstanding employee." Maj. Op. at 15. As a preliminary matter, while the Board did find that Mr. Miller made a prima facie case that he made a protected disclosure that was a contributing factor in the reassignment, J.A. 132–35, the burden then shifted to the agency to demonstrate by clear and convincing evidence that it would have made the reassignment in the absence of the disclosures. J.A. 135. That is the sole issue on appeal here, and the *Carr* factors—which the majority concedes govern here—do not consider the employee's success in making a prima facie case of whistleblower reprisal. Indeed, it is the employee's success in doing so that mandates the consideration of the *Carr* factors in the separate inquiry into the agency's reasons for the reassignment. Furthermore, the majority mischaracterizes both the Board's finding and the Government's position as conceding that Mr. Miller's disclosures contributed to his

reassignment. Maj. Op. at 20 ("But the dissent wholly ignores what the Board already found and the Government does not dispute on appeal: Mr. Miller 'made protected disclosures under 5 U.S.C. § 2302(b)(8) that were a contributing factor in the decision to reassign him.'" (quoting *Miller v. Dep't of Justice*, No. DA-1221-11-0401-W-3, 2015 WL 1548991 (M.S.P.B. Apr. 8, 2015)). In fact, the opposite is the case. The Government asserted and the Board clearly found that Mr. Miller's disclosures did not contribute to his reassignments, which is why his whistleblower claims were rejected. *See* J.A. 146 ("[T]he record demonstrates that the appellant's initial and successive reassignments were precipitated by an external OIG investigation."); Resp. Br. at 10–12.

The majority also apparently believes that OIG is so closely tied to the agency that an OIG representative should have testified as to Mr. Miller's removal, and that the Board should have assessed whether OIG had a possible retaliatory motive.[3] That suggestion evidences a

---

[3] The concurrence goes further and suggests that the case should, in fact, be remanded for the agency to affirmatively demonstrate a lack of any retaliation by OIG. *See* Concurring Op. at 2–3. But, as noted above, that theory of whistleblower retaliation was never presented to the Board or even suggested to this court—it was only suggested by members of the majority. An agency should not be required, under *Carr* factor two, to disprove theories of retaliation that were never presented to the Board and not part of the prima facie case. The burden does not shift to the agency until a prima facie case has been made which makes sense. A prima facie case is made by showing a protected disclosure, a prohibited personnel action, and knowledge of the disclosure within temporal proximity by the official taking the

misunderstanding of the role of the Inspectors General in our federal government. The OIGs are, by congressional design, objective units independent from the respective agencies. Their purpose is, among other things, to detect fraud and abuse. *See* Inspector General Act of 1978, Pub. L. 95–452, § 2, 92 Stat. 1101 (1978). And, in doing so, they often rely on reports from whistleblowers. *See* 5 U.S.C. § 2302(b)(8)(B) (protecting whistleblower disclosures to the Inspectors General). To suggest that the OIG would retaliate against a whistleblower flies in the face of its congressionally mandated mission. But this discussion is beside the point because there is no evidence that OIG had a retaliatory motive. It is purely speculative and has no place in a substantial evidence review.[4]

In any event, there is no dispute that Warden Upton was Mr. Miller's direct supervisor and had the sole authority to reassign him. Therefore, the majority errs in faulting the Government for failing to provide testimony from OIG.

---

personnel action. *See, e.g.*, *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012). Our precedent does not require an agency to go further and disprove other possible retaliatory actions when no prima facie case has been made. And if it does, it ought to be corrected.

[4] It is, however, potentially dangerous dicta, to the extent it suggests, that OIG might have some affirmative duty to explain its reasoning for a reassignment during an investigation or provide evidence of why it is necessary for these reassignments to take place. The circumstances of their various investigations can and do involve extremely sensitive and/or potentially criminal actions. A requirement that OIG disclose anything to the agency it is investigating has the potential to damage an ongoing investigation.

Finally, the majority fails to appreciate the impact of its decision on the agency. The majority's reversal of the Board's decision likely means that Mr. Miller will succeed in his claim of whistleblower reprisal since the Court has now ruled that the agency failed to rebut his prima facie case. Under the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 (the No FEAR Act), the agency likely will be required to report this case to Congress. *See* Pub. L. 107-174, § 203, 116 Stat. 569 (2002). The majority's decision will require this report even though the majority cannot cite to a single piece of affirmative evidence that Mr. Miller was reassigned for whistleblowing. In addition, Warden Upton will be associated with taking a personnel action that the majority now labels as whistleblower retaliation, even though the Board found his testimony credible and there is nothing in the record to indicate that he either lied or reassigned Mr. Miller for whistleblowing activity. Thus, the majority's opinion not only does damage to the law, but also harms, without any evidence of wrongdoing, a government supervisor with over 20 years of federal service.

At the end of the day, after denying that it is making a de novo credibility determination or imposing a corroboration requirement for the deciding official's testimony, the majority's basis for reversing the Board's decision seems to be that something "more" was required. But our statutorily limited scope of review over Board decisions conflicts with the majority's requirement for "more." *See* 5 U.S.C. § 7703(c)(3) (as applicable here, we may only "hold unlawful and set aside any agency action, findings, or conclusions found to be . . . unsupported by substantial evidence"). I don't dispute that additional evidence, such as more detailed testimony from Warden Upton about OIG's request to reassign Mr. Miller—for example, the requesting investigator's name, or an affidavit from OIG averring to the requested reassignment—would certainly

have bolstered the agency's case. But these considerations are only relevant to either credibility or corroboration, the first of which we do not review, and the second of which the majority disclaims.

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). A reviewing court must consider the record as a whole, including that which "fairly detracts from its weight." *Id.* Having pointed to no evidence that detracts from Warden Upton's testimony and, indeed, disclaiming any attack on his credibility, the majority nevertheless concludes that his testimony is insufficient for a reasonable mind to accept. Or put simply, the deciding official's credible and uncontradicted testimony about the non-retaliatory reason he took the disputed action is insufficient to establish that the action was non-retaliatory. I have never heard of such an application of the substantial evidence standard that rejects uncontradicted, truthful testimony in favor of unfounded speculation about what might have happened or what more the agency should have done.

Under the proper application of the substantial evidence review standard, I would affirm the Board's decision. From the majority's contrary conclusion, I respectfully dissent.